UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SARAH FRAGA, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PREMIUM RETAIL SERVICES, INC., <br><br> Defendant. | CIVIL ACTION NO. 21-10751-WGY |

YOUNG, D.J.                                  January 31, 2022

## MEMORANDUM & ORDER

**When you are writing laws you are testing words to find their utmost power. Like spells, they have to make things happen in the real world, and like spells, they only work if people believe in them. If your law exacts a penalty, you must be able to enforce it -- on the rich as well as the poor . . . .**

Hilary Mantel, Wolf Hall 533 (Henry Holt & Co. ed., 2009)

## I.  THE FEDERAL ARBITRATION ACT TODAY

One of the most puissant laws on the books today is the Federal Arbitration Act, 9 U.S.C. §§ 1-16, ("FAA").  See, e.g., Southland Corp. v. Keating , 465 U.S. 1, 10 (1984) ("In enacting [Section] 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22, 24

[1]

(1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); see also Katherine Van Wezel Stone, Rustic Justice: Community and Coercion Under the Federal Arbitration Act, 77 N.C.L. Rev. 931, 943-56 (1999) (describing the "extraordinarily expansive" reach of the FAA).

Fashioned by corporate America into one of its most potent weapons against its customers and its own employees, this single statute possesses the power largely to eviscerate the entire panoply of civil rights and consumer protection statutes so arduously constructed by the Congress over the years. See, e.g., American Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 234, 236 (2013) (declining to recognize a class's "entitlement to class proceedings for vindication of statutory rights" and concluding that "the fact that [a claim] is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy." (emphasis in original)). At the same time, its power warps our concepts of adhesion and unconscionability, see, e.g., AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 338, 351-52 (2011),[1]

---

[1] The present-day Supreme Court's affection for arbitration against all forms of government regulation of business is strikingly parallel to the Taft Court's reliance on "liberty of contract" to strike down similar governmental efforts at employee and consumer protection. See, e.g., Adkins v.

sets at naught the court rules allowing the little guys to band together, id. at 344 (concluding that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA"), and even marginalizes our constitutional right to trial by jury, see, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991) (holding an ADEA claimant can be subjected to compulsory arbitration and rejecting the argument that the ADEA was meant to protect claimants from a waiver of a judicial forum).

Small wonder, then, that there is an explosion of litigation by workers seeking to bring themselves within the FAA's exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1.  See, e.g., Levine v. Grubhub Holdings Inc. & Grubhub Inc., No. 1:21-cv-11742-WGY (D. Mass. removed Oct. 25, 2021) (referring dispute to arbitration).

This is such a case.

---

Children's Hosp., 261 U.S. 525, 554-58 (1923) (invalidating a minimum wage law for women as "legislative interference with freedom of contract"); see also Felix Frankfurter & Nathan Greene, Legislation Affecting Labor Injunctions, 38 Yale L.J. 879, 890 (1929).  Today -- after the Great Depression -- these cases are largely forgotten.  What we remember are the powerful dissents of two Bostonians -- Justices Holmes and Brandeis.  See Stephen Budiansky, Oliver Wendell Holmes: A Life in War, Law and Ideas 404-12 (W.W. Norton & Co. ed. 2019).

[3]

## II.   THE PRESENT CASE - PROCEDURAL SETTING

Fraga filed this present action, individually and on behalf of other people who are similarly situated, against her former employer, Premium Retail Services, Inc. ("Premium") on May 7, 2021.  See Collective & Class Action Compl. ("Compl."), ECF No. 1.  Fraga alleges four claims in her complaint: (1) violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et. seq.; (2) violation of the Massachusetts Minimum Fair Wage Law (overtime), Mass. Gen. Laws ch. 151 §§ 1A-B; (3) violation of Massachusetts Minimum Fair Wage Law (timely wage payment), Mass. Gen. Laws ch. 151 §§ 1A-B; and (4) violation of Massachusetts Minimum Fair Wage Law (minimum wage), Mass. Gen. Laws ch. 151 §§ 1, 7, 20.  Compl. ¶¶ 77-88, 80-93, 94-98, 99-102.

Premium moved to compel arbitration pursuant to the FAA, 9 U.S.C. §§ 3, 4, and, in the alternative, to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). See Mot. Compel Arb. & Dismiss Compl., ECF No. 7; Def. Premium Retail Services, Inc.'s Mem. P. & A. Supp. Mot. Compel Arb. ("Def.'s Mem."), ECF No. 8.  Fraga timely opposed Premium's motion.  Mem. Law Opp'n Def.'s Mot. Compel Arb. ("Opp'n Mem."), ECF No. 16.

Fraga's opposition raised three arguments: 1) Premium failed to meet its burden to show the arbitration agreement (the "Agreement") was valid and enforceable; 2) Fraga's claims are

[4]

not covered by the Agreement; and 3) that she, and others similarly situated, are exempt under the residual clause of Section 1 of the FAA.  See Opp'n Mem. 4-12.

The first two arguments are but forlorn hopes, marched out onto barren factual ground to be shot down by established precedent.  The Court deals with them in the Appendix.  The third, however, is intriguing and, while it skirts the boundary of the Section 1 exemption, requires denial of the motion to dismiss.

## III.  THE PRESENT CASE -- FACTS PLAUSIBLY PLED

Fraga was an employee of Premium from December 2020 to January 2021.[2]  Compl. ¶ 25.  Premium, headquartered and incorporated in Chesterfield, Missouri, id. ¶¶ 7, 8, provides varying retail support to its clients, id. ¶¶ 21, 22; see also Premium, https://premiumretail.com (last visited Jan. 25, 2022). It employs thousands of Merchandisers in all fifty states. Compl. ¶ 22.

Merchandisers' duties include, but are not limited to, auditing and stocking product, building product displays, and updating product pricing and signage, see id. ¶ 24, as well as staging the point-of-purchase ("POP") materials, see id. ¶¶ 43-

_____

[2] Fraga's complaint states Fraga worked for Premium from December 2020 to January 2021.  Compl. ¶ 25.  Fraga's Declaration, however, states she worked there from December 2020 to March 2021.  Pl. Decl. ¶ 2.

44, and traveling between their weekly preassigned jobsites to deliver and install the POP materials, see id. ¶ 28.  Staging the POP materials involves receiving, sorting, and arranging POP displays, taking stock of material required for each job assignment, and ensuring that displays are paired with the appropriate assignment.  Id. ¶ 43.  These materials are shipped from outside of Massachusetts.  Opp'n Mem., Ex. 1, Decl. Sarah Fraga ("Pl. Decl.") ¶¶ 3, 7, ECF No. 16-1.  Once the Merchandisers have completed staging the materials, they must transport them to the designated retail location.  Pl. Decl. ¶ 6; Compl. ¶¶ 22, 43.

Premium assigns each Merchandiser a zone of store locations to which the Merchandiser must travel to fulfill their job assignments.  Compl. ¶ 28.  The Merchandisers clock in and out of each worksite using the Q-Trax mobile application, which is a job management system utilized by Premium.  Id. ¶¶ 31-32.  Premium's time-clock policy is that the Merchandisers may only clock-in on Q-Trax when they arrive at the first store for the day and must clock out as they leave that store.  Id. ¶¶ 31-32, 47.  Premium does not pay Merchandisers for their time spent on staging or traveling.  Id. ¶ 47.

Fraga was employed as a Merchandiser.  Id. ¶ 25.  Her zone of store locations included Massachusetts, Connecticut, New Jersey, and New York.  Id.; Pl. Decl. ¶ 2.  Fraga would visit up

to or more than five retailers in one day.  Compl. ¶ 30.
Depending on the day, these retailers were located within or
outside of Massachusetts.  Id. ¶ 28 (explaining that
Merchandisers received preassigned jobsites that varied).  Fraga
alleges Premium only paid her for work performed at the
jobsites, after she clocked into the Q-Trax application, and did
not account for travel or staging time.  Id. ¶¶ 26, 31-32.

Fraga alleges the staging duties are executed at the
Merchandisers' homes.[3]  See id.  ¶¶ 43-47.  Fraga states that she
was not compensated for performing these duties since they are
not completed at the retail location where the Merchandiser is
able to clock in.  Id. ¶ 47.  Fraga alleges Premium's policy of
not compensating Merchandisers for "off-the-clock" time is
depriving her, and others similarly situated, of wages earned
from staging duties and travel time.  Id. ¶ 48.  Thus, Fraga
brings this lawsuit as a collective action on behalf of any
other similarly situated individuals who may opt in.  Id. ¶¶ 62-
63.

_____

[3] This is a crucial allegation.  In its declaration, Premium
avers that its general practice is to ship the staging materials
to the point of sale and the actual staging takes place there.
Reply Supp. Def. Premium Retail Services, Inc.'s Mot. Compel
Arb. ("Def.'s Reply"), Ex. 1, Suppl. Aff. Patricia K. Balkenbush
Supp. Def.'s Mot. Compel Arb. ("Def. Aff.") ¶ 6, ECF No. 19-1.
At oral argument, see Electronic Clerk's Notes, ECF No. 39,
however, Premium's counsel (at least to argue in favor of
dismissal) assumed the accuracy of Fraga's allegations.

## IV.   ANALYSIS

Since arbitration alone can supervene many constitutional and most statutory norms, it is no surprise that the scope of the exemption found in 9 U.S.C. § 1 must be construed narrowly. Cunningham v. Lyft, Inc., 17 F.4th 244, 251 (1st Cir. 2021). Even so, courts have the singular authority "to determine whether an agreement is excluded from FAA coverage even where there is a delegation clause." Singh v. Uber Techs. Inc., 939 F.3d 210, 215 (3rd Cir. 2019) (citing New Prime, Inc. v. Oliveria, 139 S. Ct. 532, 538 (2019)); Cunningham v. Lyft, Inc., 450 F.Supp.3d 37, 43 (D. Mass. 2020) (Talwani, J.) overruled on other grounds, 17 F.4th 244 (1st Cir. 2021).   Should the FAA not apply, state law determines the enforceability of an arbitration agreement.   See Waithaka v. Amazon.com Inc., 966 F.3d 10, 26 (1st Cir. 2020) (concluding Amazon delivery drivers were exempt from the FAA and deciding whether arbitration should be compelled under state law).

### A. Broad Purpose of the FAA

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.   Section 2 has been

[8]

recognized as reflecting Congress's "intent to exercise [its] commerce power to the full." Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 277 (1995), cert. denied, No. 20-1077, 2021 WL 2519107 (U.S. June 21, 2021), reh'g denied, No. 20-1077, 2021 WL 3275777 (U.S. Aug. 2, 2021); see also Waithaka, 966 F.3d at 16. Despite the broad scope of Section 2, Congress exempted certain categories of workers from the FAA's coverage. See 9 U.S.C. § 1. Thus, "while a court's authority under the [FAA] to compel arbitration may be considerable, it isn't unconditional." New Prime, 139 S. Ct. at 537.

This case concerns the scope of the exemption contained in the residual clause of Section 1 of the FAA. Section 1 carves out an exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 (emphasis added).

By including the residual exclusion of "'any other class of workers engaged in foreign or interstate commerce,' . . . Congress [sought] to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation." Cir. City Stores, Inc v. Adams, 532 U.S. 105, 121 (2001) (quoting 9 U.S.C. § 1). Furthermore, "Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods explains the linkage to the two specific,

enumerated types of workers identified in the preceding portion

of the sentence." Id. Congress thus created the narrow

exemption to assure arbitration could survive and grow,

notwithstanding judicial scrutiny, while at the same time not

impeding the essential wheels of commerce traditionally subject

to Congressional regulation.

### B. Scope of the Section 1 Exemption

The Supreme Court in Circuit City v. Adams adopted a narrow

reading of the FAA's Section 1 exemption, rejecting the notion

that all employment contracts are excluded from the FAA's grasp.

532 U.S. at 109-10. The residual clause -- "any other class of

workers engaged in foreign or interstate commerce," 9 U.S.C. §

1, -- was central to the Court's conclusion. Id. at 121. In

analyzing the clause's language, the Court utilized the

statutory canon of ejusdem generis, which posits that when terms

are part of an enumerated list, general words ought be read in

light of the more specific objects that precede them. See id.

at 114-15. Applying this rule, the Court concluded that the

residual clause's meaning was "controlled and defined" by the

preceding terms "seaman" and "railroad employees." See id. at

115. It also compared the FAA's residual clause to near-

identical language in Section 7 of the Clayton Act, 15 U.S.C. §

18; see Circuit City, 532 U.S. at 117-19, which the Supreme

Court had already read to encompass less than Congress' Commerce

Clause power, see United States v. American Building Maintenance Industries, 422 U.S. 271, 277-83 (1975); cf. Gulf Oil Corp. v. Copp Paving Co., Inc., 419 U.S. 186, 202 (1974).

Nonetheless, Circuit City only went so far. First, it did not define the boundaries of precisely who qualifies as being "engaged in interstate commerce" under the residual clause. See Circuit City, 532 U.S. at 117. Second, the Circuit City Court did not "address the nuances between different types of transportation workers" -- lower courts were left to define which particular classes of transport workers fell within the exemption. See Cunningham, 450 F.Supp.3d at 43. For example, recently, in Waithaka v. Amazon.com, the First Circuit grappled with whether the plaintiff who worked as a "last mile" delivery driver for Amazon.com, Inc., fell into this category. 966 F.3d at 13. These last-mile delivery drivers are independent contractors who collect packages for delivery and generally do not cross state lines. Id. at 15. The First Circuit held "last-mile delivery drivers who haul goods on the final legs of interstate journeys are transportation workers . . . regardless of whether the workers themselves physically cross state lines." Id. at 26.

Determining who "qualifies as a transportation worker is not always an easy task," Saxon v. Southwest Airlines Co., 993

F.3d 492, 494 (7th Cir. 2021), but it is one which falls to this
Court.

### C. The Case at Bar

Fraga analogizes her job duties to that of a last-mile
delivery driver.  See Opp'n Mem. 10-11.

In doing so, Fraga argues that she, and similarly situated
Merchandisers, were (or are) "workers engaged in foreign or
interstate commerce" who are exempt from the enforcement
provisions of the FAA, and by extension Premium's related class
action waiver and the Agreement itself is unenforceable under
Massachusetts law.  See id. 9-12.  Supporting her argument,
Fraga analogizes her job to last-mile delivery workers in that
she allegedly received POP materials traveling interstate and
"transported, delivered, and installed [the] POP materials at
various retail locations in Massachusetts, Connecticut, New
Jersey, and New York."  Id. 11.  Fraga argues the nature of her
work "constitute[s] part of the continuous flow of interstate
commerce" and is therefore covered by the exemption.  Id.
(internal quotation marks omitted).

Premium attempts to refute Fraga's argument by asserting
she is a "retail worker" and refers to herself as such, and thus
that she is not covered by the exemption.  Reply Supp. Def.
Premium Retail Services, Inc.'s Mot. Compel Arb. ("Def.'s
Reply") 6-7, ECF No. 19.  To support its contention that retail

[12]

workers are not exempted from the FAA, Premium cites cases outside this jurisdiction that hold that such employees are not covered by the Section 1 exemption. Id. 7-8 (citing Hill v. Rent-A-Center, 398 F.3d 1286 (11th Cir. 2005); Adkins v. Labor Ready, Inc., 303 F.3d 496 (4th Cir. 2002)).

It is not the title of the worker, however, that is the key focus of the analysis but rather the actual activities performed. See Waithaka, 966 F.3d at 22 ("The nature of the business for which a class of workers perform their activities must inform that assessment."). It is not required that a class of workers be employed by an interstate transportation business nor "a business of a certain geographic scope to fall within" Section 1. Id. at 23; see also Saxon, 993 F.3d at 497 (holding "a transportation worker need not work for a transportation company"). Thus, this Court's inquiry must venture deeper than whether Fraga can properly be labeled a "retail worker."

### 1. Defining Interstate Commerce

The scope of Section 1 turns in part on whether the particular employee is "engaged in interstate commerce." Waithaka, 966 F.3d at 20. Statutory evidence and the boundaries of Section 1 as defined by other courts inform this analysis.[4]

---

[4] The legislative history of the FAA also confirms this Court's analysis and, indeed, suggests a more expansive reading of

[13]

---

Section 1.  Any more expansive reading, however, is a minority view, thus properly confined to this footnote.

A look down the road not taken --

Justice Steven's thoughtful dissent in Circuit City, 532 U.S. at 105, notes that the legislative history of the FAA is "extensive and well-documented" and "makes clear that the FAA was a response to the refusal of courts to enforce commercial arbitration agreements, which were commonly used in the maritime context." Id. at 124-25 (Stevens, J., dissenting) (emphasis added); see also Josue Aparicio, The Arbitration Hack: the Push to Expand the FAA's Exemption to Modern-Day Transportation Workers in the Gig Economy, 54 U.S.F.L. Rev. 397, 402 (2020). As Justice Stevens observes, the original bill which became the FAA was drafted by the Committee on Commerce, Trade, and Commercial Law of the American Bar Association ("ABA") "upon consideration of 'the further extension of the principle of commercial arbitration.'" Id. at 125 (alteration in original) (quoting Report of the Forty-third Annual Meeting of the ABA, 45 A.B.A. Rep. 75 (1920)).  Importantly, the original bill did not even include the exemption provision at issue in this case. Aparicio, supra, at 402.

Consistent with the original bill's spirit, the chair of the ABA committee and drafter of the bill testified that the bill was drafted in response to judicial hostility toward arbitration between commercial businesses and not towards labor disputes.  Circuit City, 532 U.S. at 127 (Stevens, J., dissenting) (noting that at the Senate hearing, the drafter testified, "[i]t is not intended that this shall be an act referring to labor disputes at all" (internal quotation marks omitted) (emphasis added)).  The exemption was added for the same reason that the Bill of Rights was added to the Constitution: to appease those concerned that the literal language of the Act would not protect them.  Id. (noting that the same drafter stated, "but if your honorable committee should feel that there is any danger of [an act referring to labor disputes], they should add to the bill the following language, 'but nothing herein contained shall apply to seamen or any class of workers in interstate and foreign commerce.'").  In the next session of Congress, Herbert Hoover, then-Secretary of Commerce, echoed this concern and added this cautionary textual exemption and suggested, "[i]f objection appears to the inclusion of workers' contracts in the law's scheme, it might be well amended

[14]

by stating, 'but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce.'" Id. In short, the exemption was an added safeguard for those nervous that the FAA would swallow workers' potential labor disputes, just like the Bill of Rights was a safeguard designed to appeal to the anti-Federalists. See The Federalist No. 84 (Alexander Hamilton). Here, by explicitly listing a particular class of workers because those were the primary groups that concerned the legislators, Congress has created the same kind of confusion, namely the negative implication that only workers like "seamen," "railroad employees," and those involved in "foreign or interstate commerce" are exempt from the coverage of the FAA.

Given this legislative history, it is no surprise that Justice Frankfurter also understood the FAA's exemption to exclude any labor disputes or employment contracts out of the FAA's coverage. In Textile Workers v. Lincoln Mills of Ala., the Court considered whether a federal court may enforce an arbitration clause in a collective bargaining agreement under Labor Management Relations Act ("LMRA"). 353 U.S. 448, 457-58 (1957). There, the union argued that the federal court had such authority under Section 301 of the LMRA and under Section 2 of the FAA. See generally Brief for Petitioner, Textile Workers, 353 U.S. 448 (No. 211). To argue that such authority exists under Section 2 of the FAA, the Union asserted that a collective bargaining agreement is not a "contract of employment" for the purpose of the FAA's exemption or, alternatively, that the exemption was limited to transportation workers. See id. 53-59. The Court rejected these two arguments and instead held that the federal court had authority to compel arbitration under Section 301 of the LMRA. Textile Workers, 353 U.S. at 451-56. The Court's reliance on the LMRA instead of the FAA, as Justice Frankfurter notes, implicitly betrays its conclusion that the FAA did not apply because the exemption excluded labor contracts like collective bargaining agreements:

> In 1925, Congress passed the United States Arbitration Act, 9 U.S.C. § 1 et seq., making executory agreements to arbitrate specifically enforceable in the federal courts, but explicitly excluding "contracts of employment" of workers engaged in interstate commerce from its scope. Naturally enough, I find rejection, though not explicit, of the availability of the

### a. Statutory Evidence

In determining the definition of the phrase "engaged in . . . interstate commerce," 9 U.S.C. § 1, the rule of in pari materia and statutory context are helpful.   The rule of in pari materia recognizes that "a legislative body generally uses a particular word with a consistent meaning in a given context." Erlenbaugh v. United States, 409 U.S. 239, 243 (1972).   As for the statutory context, a court may turn to similar provisions elsewhere in the law to gather evidence of statutory meaning. See, e.g., Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or., 515 U.S. 687, 717 (1995) (Scalia, J., dissenting) (considering "the sense in which [the disputed statutory term] is used elsewhere in federal legislation and treaty").

---

Federal Arbitration Act to enforce arbitration clauses in collective-bargaining agreements in the silent treatment given that Act by the Court's opinion.   If an Act that authorizes the federal courts to enforce arbitration provisions in contracts generally, but specifically denies authority to decree that remedy for "contracts of employment," were available, the Court would hardly spin such power out of the empty darkness of [Section] 301 [that did not specifically mention arbitration].

Id. at 466 (Frankfurter, J., dissenting); see also Circuit City, 532 U.S. at 130-31 (Stevens, J., dissenting) (making this argument as to the early Court's understanding of the FAA based on Textile Workers: "The fact that the Court relied on [Section] 301 of the LMRA, a statutory provision that does not mention arbitration, rather than the FAA, a statute that expressly authorizes the enforcement of arbitration agreements, strongly implies that the Court had concluded that the FAA simply did not apply because [Section] 1 exempts labor contracts").

The Supreme Court, in <u>Walling</u> v. <u>Jacksonville Paper</u>, held "interstate commerce" in the context of the FLSA to encompass the "entire movement of [goods] until their interstate journey [is] ended," which does not occur until "they reach the customers for whom they are intended." 317 U.S. 564, 567-68 (1943); <u>see also</u> <u>Archer</u> v. <u>Grubhub, Inc.</u>, No. 1984CV03277BLS1, 2021 WL 832132, at *20-21 (Mass. Super. Ct. Jan. 13, 2021) (Davis, J.) (quoting <u>Walling</u>, 371 U.S. at 567-68). Under this reasoning, whether an individual worker crosses a state line is not dispositive of whether they engage in interstate commerce. <u>See</u> <u>Waithaka</u>, 966 F.3d at 26. This also would suggest that a worker need not work for a transportation company to be considered a transportation worker. <u>See</u> <u>Saxon</u>, 993 F.3d at 497.

The Federal Employer's Liability Act (the "FELA") provides an even closer statutory parallel for defining the term "engaged in commerce" in the FAA. <u>See</u> <u>Waithaka</u>, 966 F.3d at 19; <u>see also</u> <u>Tenney Eng'g, Inc.</u> v. <u>United Elec. Radio & Mach. Workers of Am.</u>, 207 F.2d 450, 452-53 (3d Cir. 1953). The FELA, passed in 1908, contains nearly identical language to Section 1 of the FAA. 45 U.S.C. § 51 (1908) ("Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . ."). The

[17]

Supreme Court construed this language to include "employees engaged in interstate transportation <u>or in work so closely related to it as to be practically a part of it</u>." <u>Shanks</u> v. <u>Del., Lackawanna & W.R.R.</u>, 239 U.S. 556, 558-59 (1916) (emphasis added); <u>see also</u> <u>Tenney</u>, 201 F.2d at 453 (citing <u>Shanks</u>, 239 U.S. at 558). Given that Congress "incorporat[ed] almost exactly the same phraseology" into the FAA, Congress may be assumed to have enacted the FAA with the FELA in mind; thus, the same construction ought apply. <u>See</u> <u>id.</u>

### b. Courts' Definitions Anent Section 1's Scope

The exact scope of the Section 1 exemption has been examined by several courts, in varying jurisdictions. <u>See</u> <u>Waithaka</u>, 966 F.3d at 26 (ruling that last mile delivery drivers are engaged in interstate commerce and thus exempted from FAA coverage); <u>Saxon</u>, 993 F.3d at 501 (holding cargo loaders are "so closely related to interstate transportation as to be practically a part of it" (internal quotation marks omitted)); <u>Singh</u>, 939 F.3d at 214, 226 (holding that Section 1 extends to workers "so long as they are engaged in work <u>so closely related thereto as to be in practical effect part of it</u>" and remanding to the district court to determine whether Uber drivers fell under this definition (emphasis added)); <u>United Elec., Radio & Mach. Workers of Am.</u> v. <u>Miller Metal Prod.</u>, 215 F.2d 221, 222 (4th Cir. 1954) (holding "the controversy fell within the

exclusion clause of the arbitration act because it arose out of a contract of employment of workers engaged in interstate commerce"); Tenney, 207 F.2d at 453 (3rd Cir. 1953) (holding that employees engaged in the production of goods for subsequent sale in interstate commerce were not a class of workers engaged in interstate commerce within the meaning of the exemption); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 836 (8th Cir. 1997) (concluding the exemption applies to "workers actually involved 'within the flow' of interstate commerce," and holding the FAA exclusion did not apply); Immediato v. Postmates, Inc., No. CV 20-12308-RGS, 2021 WL 828381, at *2 (D. Mass. Mar. 4, 2021) (Stearns, J.) (recognizing food delivery services are "distinguishable from Amazon's last-mile delivery workers" (internal quotation marks omitted)).

In interpreting the exemption's scope, the First Circuit in Cunningham v. Lyft teaches it ought be narrowly construed.   17 F.4th at 253.   It also counsels, however, that when interpreting Section 1, courts should apply the canon of ejusdem generis -- that is, residual language of the exemption ought be read to include objects similar in nature to those enumerated in the preceding terms "seamen" and "railway employees."   Id.   In 1925 the statutory definitions of "seamen" and "railroad employees" were understood to include workers who were not themselves engaged in transportation activities.   In New Prime v. Oliveria,

the Supreme Court noted that "[a]t the time of the [FAA]'s passage, shipboard surgeons who tended injured sailors were considered 'seamen' . . . ." 139 S. Ct. at 542-43.  In supporting its proposition, the Court cited to cases suggesting that workers not involved in the transport functions of passenger ships were nonetheless seamen.  See id. at 543 n.10 (citing The Sea Lark, 14 F.2d 201, 201-02 (W.D. Wash. 1926) (describing cooks, surgeons, and bartenders as seamen, and holding that musicians on a boat used for excursions were seamen); The Buena Ventura, 243 F. 797, 799 (S.D.N.Y. 1916) (discussing a case that "held that a warranty to carry '30 seamen besides passengers' meant that the 30 seamen included a cook, a surgeon, and other employe[e]s" (citation omitted)); Allan v. State S.S. Co., 132 N.Y. 91, 95-99 (1892) (discussing the duty arising from Great Britain's Passenger Act of 1855 of "defendant[,] a common carrier of passengers," to employ a shipboard surgeon with an appropriate supply of medicines)).  The Court also referenced the 1898 Erdman Act's "broad understanding of 'railroad employees,'" which encompassed "all persons actually engaged in any capacity in train operation or train service of any description." Id. at 543 & n.12.  The workers contemplated in these cases did not operate the ships aboard which they were employed.  Nevertheless, they were held to be "seaman" for the purposes of the FAA.  One might say,

their work -- as cooks, surgeons, bartenders, musicians, etc. -- was "so closely related to [] as to be practically a part of" interstate transportation.  Shanks, 239 U.S. at 558.

Furthermore, the Supreme Court has held that railroad workers, stevedores, and longshoremen responsible for loading and unloading cargo from a train or ship at port are part of interstate transportation.  See Puget Sound Stevedoring Co. v. State Tax Comm'n, 302 U.S. 90, 92 (1937) (holding that work "consist[ing] of the loading and discharge of cargoes by longshoremen . . . is interstate or foreign commerce" for the purpose of taxation), overruled on other grounds, Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos., 435 U.S. 734 (1978); N. Coal & Dock Co. v. Strand, 278 U.S. 142, 144 (1928) (applying admiralty law because "the unloading of a ship is not matter of purely local concern" but rather "has direct relation to commerce and navigation"); Balt. & O. S. R. Co. v. Burtch, 263 U.S. 540, 544 (holding "that the loading or unloading of an interstate shipment by [railroad] employees . . . is so closely related to interstate transportation as to be practically a part of it"); see also Saxon, 993 F.3d at 497-98 (1924) (citing inter alia, Puget Sound Stevedoring v. State Tax Commission, North Coal and Dock v. Strand, and Baltimore and Ohio Southwestern Railroad v. Burtch as demonstrating that cargo loaders are "engaged in commerce for purposes of [Section] 1").

[21]

These cases illustrate that an employee whose work is closely related to the act of transporting, but that does not necessarily involve the act of transportation itself, is covered by Section 1 of the FAA. "Seamen" and "railroad employees" encompasses not only those who operate the multimodal transit systems crossing state lines, but also those who contribute to their operation. Not all occupations that may be classified as "transportation workers" today could have been contemplated at the time the FAA was enacted. Yet as society advances, so too must the law.

While the First Circuit has yet to define the exact contours of the residual clause -- having expressly reserved the question of whether the definition of "engaged in commerce" includes those "so closely related to interstate transportation as to be practically a part of it" for a later date, see Waithaka, 966 F.3d at 20 & n.9 (internal quotation marks omitted) --, this Court, for the first time, addresses the question. In line with several of our sister circuits, this Court reads the residual clause to include those "so closely related [to interstate transportation] as to be in practical effect part of it." See Tenney, 207 F.2d at 452 (emphasis added); Saxon, 993 F.3d at 494; Patterson, 113 F.3d at 836. This framework allows workers engaged in interstate commerce to be broken down into three categories: 1) "workers who themselves

carried goods across state lines"; 2) "those who transported goods or passengers that were moving interstate"; and 3) those "in positions so closely related to interstate transportation as to be practically a part of it." See Waithaka, 966 F.3d at 20 (internal quotation marks omitted).

## 2. Applying the Test

Having confined its inquiry to the first and second categories of workers above, the First Circuit in Waithaka did not define who exactly is "so closely related to interstate transportation as to be practically a part of it." Id. at 20 (internal quotation marks omitted). It did, however, provide illustrative examples: "Workers sorting goods in warehouses during their interstate journeys or servicing cars or trucks used to make deliveries." Id. at 20 n.9. These examples are in line with employees identified in Shanks v. Delaware, Lackawanna and Western Railroad as being "so closely related" to interstate transportation "as to be practically a part of it." 239 U.S. at 558. The Shanks Court explained that employees have met this test where they were servicing, assisting, repairing, or briefly moving interstate multi-modals, interstate cargo, or bridges regularly used in interstate transportation. Id. at 558-59 (collecting cases).

Fraga's work is akin to the First Circuit's examples and meets this test. Fraga's primary duties included "receiving,

sorting, and preparing [POP] display materials . . . ."  Pl.
Decl. ¶ 4 (emphasis added).  The POP display materials were
shipped from outside of Massachusetts to Fraga's Massachusetts
home -- i.e., moving interstate --, then Fraga transported the
POP display materials to their final destination.  Id. ¶¶ 5-7.
When Fraga engaged with the goods, they were in the midst of
their interstate journey.  Fraga was a part of the intrastate --
and at times interstate -- leg of an integrated interstate
journey, intercepting the goods mid-journey and facilitating
their movement to their final destination.

Fraga's job duties at home are similar to a worker sorting
goods in a warehouse during their interstate journeys.  Prior to
delivering the goods to their final destination, she "search[ed]
and sort[ed] through the POP materials" to determine which of
the POP materials needed to go to which retail location.  Id. ¶
6.

Fraga served as an integral part of delivering the goods to
their end destination.  This is the essence of handling goods
that travel interstate.  "Interstate commerce encompasses the
entire movement of [goods] until . . . they reach the customers
for whom they are intended."  Archer, 2021 WL 832132, at *7
(emphasis added) (internal quotation marks omitted) (quoting
Walling, 371 U.S. at 566-68).  The customers for whom the

[24]

inventory, i.e., the POP display materials, is intended are the retail stores.

Under the Shanks and Waithaka definitions of who falls within interstate commerce, workers who are sufficiently engaged with interstate commerce -- whether or not they are "transportation workers," work for a transportation company, or cross state lines -- fall within the third category delineated of workers "so closely related." For example, while a worker who works as a residential electrician would not be encompassed in this definition, a worker who delivers and assembles furniture, traveling interstate, would be.

Electricians provide a service and would be hard pressed to demonstrate they are engaged in interstate commerce. Electricians install and maintain all the electrical and power systems for homes, businesses, and factories. In providing this service, electricians bring with them tools and wiring. While it is necessary for an electrician to bring wiring -- which may have originated out-of-state -- to the job site, can this appropriately be classified as engaging in interstate commerce? The commonsense answer is no. Similar to food delivery services, this work is not sufficiently engaged in interstate commerce to fall within the third category.

Furniture assembly and delivery work on the other hand is sufficiently engaged in interstate commerce, because the work

constitutes the last leg of an integrated interstate journey,
assuming the couch first travels interstate.  When consumers
purchase a large piece of furniture, such as a couch, typically
they are not able to take it home the day of purchase.  Instead,
it must be delivered at a later date.  When the couch is
delivered, workers bring the couch into the residence and
assemble the pieces into a usable product for the customer.  The
worker is engaging in a service by building, placing, and
positioning the couch in the residence.  This service work,
however, does not change the interstate commerce nature of
transporting the couch from factory to living room.

Fraga's job duties are analogous to the work in the latter
example.  While her work entails providing a service, she
transports the goods used in that service, which were previously
travelling interstate.  Her home served as a "warehouse" where
the materials were staged before embarking on the final leg of
travel.  See Waithaka, 966 F.3d at 20 n.9 (declining to state
that workers sorting goods in "warehouses" fall outside the
scope of Section 1).

The nature of Premium's business as a retail-support
provider aids in this analysis.  Waithaka, 966 F.3d at 22
(noting the nature of the business informs the courts'
assessment of whether a worker falls within the exemption).  The
fact that Premium is not a transportation company and classifies

its Merchandiser employees as "retailers" is not dispositive,
see Saxon, 993 F.3d at 497, rather, its activity in shipping
inventory is crucial to this Court's analysis.  Premium attempts
to characterize Fraga's work as solely retail, arguing she only
provided a service, like a residential electrician.  In reality,
Fraga also engaged in transporting interstate inventory -- like
the furniture delivery employee -- such that she is "practically
a part of" of interstate commerce.

"A large part of Premium's business . . . involves
assisting retail stores stock inventory, creat[ing] merchandise
displays, and keep[ing] product pricing and signage up to date."
Def.'s Reply, Ex. 1, Suppl. Aff. Patricia K. Balkenbush Supp.
Def.'s Mot. Compel Arb. ("Def. Aff.") ¶ 3, ECF No. 19-1.  An
instrumental part of Premium providing this service is the
shipment and delivery of POP display materials.  While Premium
primarily markets itself as a service -- setting up displays --,
the advertising materials it provides with its service are
equally important.  Without them, their services would be
useless.  Premium is hired as a wholesale alternative for stores
such as Walmart, CVS, and grocery stores to spare them from
having to procure display and other advertising materials for
products they carry.  See Def. Aff. ¶ 3 (stating "[a] large part
of Premium's business focuses on retail merchandising");
Premium, https://premiumretail.com/merchandising/ (last visited

[27]

Jan. 25, 2022) ("Premium builds, audits, and maintains
sophisticated interactive displays that reflect the quality and
innovativeness of your brand.  We minimize downtime by
warehousing your display components, shipping parts quickly, and
prioritizing repairs.").  The shipping and delivery of this
inventory and other materials is vital to Premium's commercial
success.

Fraga, as a Merchandiser, is not a retail worker in the
traditional sense.  She receives goods from outside the
Commonwealth of Massachusetts, sorts and prepares the goods, and
delivers them to their intended retail location.  Pl. Decl. ¶¶
4-7.  Contrary to Premium's assertion, Fraga -- as a
Merchandiser -- is not occasionally assigned tasks relating to
interstate commerce; rather, a core part of her job is receiving
goods moving interstate and continuing the transportation of the
goods.

Thus, Fraga's work is "so closely related to interstate
transportation as to be practically a part of it," see Waithaka,
966 F.3d at 20 (internal quotation marks omitted), and therefore
is covered by the FAA's exemption.

## V.   MASSACHUSETTS ARBITRATION LAW

Having concluded, at least for the purpose of ruling on
this motion to dismiss, that Fraga is exempt under Section 1 of
the FAA, this Court must now decide whether such arbitration may

still be compelled pursuant to the law of Massachusetts.  See Waithaka, 966 F.3d at 26.

Where freed from the shackles of the FAA, citizens of Massachusetts live under a somewhat different set of values. Like all citizens, they may freely enter into contracts, Perez-Tejada v. Mattress Firm, Inc., No. CV 17-12448-DJC, 2019 WL 830450, at *4 (D. Mass. Feb. 21, 2019) (Casper, J.) ("A valid and enforceable contract under Massachusetts law exists when the parties agree to the material terms and have a present intention to be bound by that agreement." (internal quotation marks omitted)), and these contracts may include arbitration provisions which are generally considered valid and enforceable, see, e.g., Paradise v. Eagle Creek Software Servs., Inc., 989 F. Supp. 2d 132, 140 (D. Mass. 2013) (Saylor, J.) (noting the Massachusetts Wage Act "does not operate as a per se bar to the arbitration of a Wage Act claim" (internal quotation marks omitted)).

In Massachusetts, however, workers are guaranteed certain statutory rights.  The Massachusetts Wage Act allows an individual to "institute a claim on his own behalf or for himself and others similarly situated."  Mass. Gen. Laws ch. 149 § 150.  It also provides that this right cannot be bargained away by contract.  Id. § 148.

[29]

In Feeney v. Dell, Inc., the Supreme Judicial Court of Massachusetts deemed it "'universally accepted' that public policy sometimes outweighs the interest in freedom of contract, and in such cases the contract will not be enforced." 454 Mass. 192, 199-200 (2009) (citing Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 422 Mass. 318, 321 (1996)). In Machado v. System4 LLC, addressing the Massachusetts Wage Laws directly, the Supreme Judicial Court recognized the Massachusetts public policy rationales "underlying the Legislature's decision to [permit] . . . class proceedings . . . ." 465 Mass. 508, 515 (2013). And in Waithaka, the First Circuit considered the public policy analysis contained in these cases and observed that the "[Supreme Judicial Court] would conclude that the right to pursue class relief in the employment context represents the fundamental public policy of the Commonwealth, such that this right cannot be contractually waived in an agreement not covered by the FAA." 966 F.3d at 29-33. This settles the matter beyond doubt -- where the FAA does not control, class action waivers are void ab initio as matter of public policy in Massachusetts.

Well then, argue the Premium folks, if we can't have our class action waiver (so that we'll hold the upper hand in individual arbitrations), then we don't want arbitration at all; we'd much rather have truly independent court adjudication if

we're going to face high stakes class litigation.  Apparently,
for Premium, 'if we can't play by my rules, I won't play at
all.'  This attitude has been derided by the courts.  See, e.g.,
the remarks of Judge William Alsup in Abernathy v. Doordash,
Inc., 438 F. Supp. 3d 1062, 1067 (N.D. Cal. 2020) ("For decades,
the employer-side bar and their employer clients have forced
arbitration clauses upon workers, thus taking away their right
to go to court, and forced class-action waivers upon them too .
. . . The irony, in this case, is that the workers wish to
enforce the very provisions forced on them . . . DoorDash, faced
with having to actually honor its side of the bargain, now
blanches at the cost of the filing fees it agreed to pay in the
arbitration clause.  No doubt, DoorDash never expected that so
many would actually seek arbitration.  Instead, in irony upon
irony, DoorDash now wishes to resort to a class wide lawsuit,
the very device it denied to the workers, to avoid its duty to
arbitrate.  This hypocrisy will not be blessed, at least by this
order."); see also Thomas L. Elkind, Some Companies no longer
requiring waiver of consumer, employment class action claims,
Massachusetts Lawyers Weekly (May 13, 2021),
https://masslawyersweekly.com/2021/05/13/some-companies-no-
longer-requiring-waiver-of-consumer-employment-class-action-
claims/ (noting that, in view of the palpable unfairness of
Supreme Court mandated individual arbitrations, reputable

arbitration providers are today restructuring their fees in an attempt to restore a level field).

Here, however, Premium has provided for this result by contract[5] and Fraga herself seeks to litigate in this Court, so I am duty bound to give effect to their contractual agreement. Because the class waiver provision is invalid as a matter of Massachusetts public policy, Fraga's class action claims may be brought in this Court.

## VI.   CONCLUSION

For the foregoing reasons, this Court concludes Fraga's work was "so closely related to interstate transportation as to be practically a part of it," see Waithaka, 966 F.3d at 20 (internal quotation marks omitted), and DENIES Premium's motion to dismiss, ECF. No. 7.

---

[5] The Arbitration Agreement includes a "Severability" provision, which states:

> If any portion of this Agreement is deemed invalid or unenforceable, the remaining portions shall remain valid and enforceable; except that in the event that the class waiver is deemed invalid or unenforceable, any claim seeking relief on behalf of a class must be brought in a court of proper jurisdiction and not in arbitration.

Def.'s Mem., Ex. 3, Premium Dispute Resolution Program ("Arb. Agreement") 5, ECF No. 8-3 (emphasis added).

Whatever one may think of Premium forcing its rights-restrictive arbitration provision on its thousands of Merchandisers, one must admire the perspicacity of its attorneys who foresaw and resolved this issue by the terms of the employment contract.

This, however, is but the opening skirmish.  The actual
battle is about to begin.  Fraga survives the motion to dismiss
only because, viewed through the prism of that procedural device
where the Court must draw all reasonable inferences in favor of
Fraga's pleading, it is plausible to infer that Premium treats
other Merchandisers as Fraga claims to have been treated.

The time for **pleading** is over; the time for **evidence** is at
hand.  The parties should note that the Court has taken no
action on the motion to compel arbitration, nor does it express
any opinion thereon.

It is, of course, not enough for Fraga to demonstrate that
she is involved in interstate commerce.  She necessarily must
demonstrate that she is a member of a **class** of workers so
situated.  Neither party has yet adequately addressed what
constitutes a "class" under the FAA Section 1 exemption.  This
jurisprudence stands wholly apart from our more familiar class
action jurisprudence as Federal Rule of Civil Procedure 23
("Rule 23") class actions came into being more than a decade
later.

It would appear that Fraga must lay out prima facie
evidence for the existence of such a "class" before she can go
much further.  The proper analog is to situations where the
existence of personal jurisdiction is factually disputed.
Because the facts alleging that Fraga (and perhaps others) is

[33]

involved in interstate commerce are so inextricably intertwined with the central claim to relief under the FLSA, they are, of course, necessarily reserved for decision by the jury.  See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 479-80 (1962).  If Fraga can make this demonstration, it then follows that she (alone) can maintain this action in this forum.

Class certification under Rule 23 raises a host of additional issues, not the least of which is the complexity of fashioning class wide relief under the FLSA.  See, e.g., Owens v. City of Malden, No. CV19-11835-WGY, 2021 WL 4974955, at *24-27 (D. Mass. Oct. 26, 2021).  One other issue is immediately apparent: upon this record, the arbitration agreement self-destructs solely because the Massachusetts Wage Act has been interpreted to bar class action waivers.  This protects Fraga and other similarly situated Massachusetts workers, yet it has no extraterritorial effect.  Do other states similarly bar class action waivers in these circumstances?  If not, exemption from the FAA is relatively meaningless since these workers will have to arbitrate on an individual basis as they do not enjoy the protections Massachusetts affords to its workers.  This raises a related question -- is Fraga an adequate representative of the class she seeks to represent?

Accordingly,

1. Premium shall timely answer Fraga's complaint.

[34]

2. The parties shall, within the same period, meet, confer, and propose a proportionate case management scheduling order to address each issue pointed out above (as well as all other issues the parties wish to resolve pre-trial), which proposed order shall have the case trial ready no later than February 2023.

**SO ORDERED.**

*William G. Young*

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[6]

---

[6] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 43 years.

[35]

**APPENDIX**

**A. Validity and Enforcement of the Agreement**

The party seeking to compel arbitration bears the burden of demonstrating that a valid agreement to arbitrate exists. See <u>Dialysis Access Ctr., LLC</u> v. <u>RMS Lifeline, Inc.</u>, 638 F.3d 367, 375 (1st Cir. 2011) ("A party seeking to compel arbitration under the FAA must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" (quoting <u>InterGen N.V.</u> v. <u>Grina</u>, 344 F.3d 134, 142 (1st Cir. 2003))).  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  <u>First Options of Chi., Inc.</u> v. <u>Kaplan</u>, 514 U.S. 938, 944 (1995); <u>see also</u> <u>Cullinane</u> v. <u>Uber Techs., Inc.</u>, 893 F.3d 53, 61 (1st Cir. 2018).

In determining whether there is a valid and enforceable arbitration agreement, the First Circuit, relying on reasoning from the Massachusetts Appeals Court in <u>Ajemian</u> v. <u>Yahoo!, Inc.</u>, 83 Mass. App. Ct. 565 (2013), articulated a two-step inquiry: "[t]he first inquiry is whether the contract terms were

'reasonably communicated to the plaintiff[],'" and "[t]he second
is whether the record shows that those terms were 'accepted and,
if so, the manner of acceptance.'"   Cullinane, 893 F.3d at 62
(quoting Ajemian, 83 Mass. App. Ct. at 575).   An online
contract, under Massachusetts law, is enforceable under a
similar showing.   See Immediato, 2021 WL 828381, at *4 (citing
Kauders v. Uber Techs., Inc., 486 Mass. 557, 572 (2021)).   Here,
both steps of the inquiry are satisfied.

**1. Reasonably Communicated**

The first inquiry is met here.   "[I]n the context of web-
based contracts . . . clarity and conspicuousness are a function
of the design and content of the relevant interface."
Cullinane, 893 F.3d at 62 (citing Meyer v. Uber Techs., Inc.,
868 F.3d 66, 75 (2d Cir. 2017)).   Massachusetts General Laws
chapter 106 includes a non-exhaustive list of general
characteristics that make a term "conspicuous," including
contrasting size and type of font, use of headings in capitals,
and setting apart the term from the surrounding text through
means of symbols or other marks.   Mass. Gen. Laws ch. 106, § 1-
201(b)(10).   "Whether a term is 'conspicuous' or not is a
decision for the court."   Id.

Fraga and other Merchandisers were provided reasonable
notice they were entering into an online arbitration agreement,
as their New Hire Paperwork outlined the arbitration agreement

[37]

documents with a bolded heading in a larger size font than the
surrounding text.  Def.'s Reply, Ex. 1-A, Premium New Hire
Paperwork ("New Hire Paperwork"), ECF No. 19-1.  Above the
signature line, the following final notice was also given in
all-capital letters:

> EACH OF THE PARTIES UNDERSTANDS THAT THIS AGREEMENT
> CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE
> ENFORCED BY THE OTHER PARTY, AND THAT BY SIGNING THIS
> AGREEMENT, EACH PARTY IS GIVING UP ITS RIGHT TO A JURY
> TRIAL FOR THE CLAIMS COVERED.

Def.'s Mem., Ex. 3, Premium Dispute Resolution Program ("Arb.
Agreement") 5, ECF No. 8-3.

Additionally, Fraga and other Merchandisers could not sign
the Dispute Resolution Program document until scrolling through
the document in its entirety.  Arb. Agreement 6.  Thus, the
arbitration agreement was conspicuously outlined and provided
sufficient notice, making it reasonably communicated.

### 2. Whether the Parties Assented to the Terms

The second inquiry is also met here.  This Court has held
that clicking an "I accept" button manifests assent and that a
signature manifests the same.  See, e.g., Murray v. Grocery
Delivery E-Services USA Inc., 460 F. Supp. 3d 93, 97 (D. Mass.
2020) (suggesting that clicking "I agree" on a clickwrap
agreement that includes an arbitration clause constitutes
assent); Bekele v. Lyft, Inc., 199 F.Supp.3d 284, 298 (D. Mass.
2016) (Saylor, J.) (holding that drivers manifested assent to

arbitrate when they electronically clicked the "I accept" button on the arbitration provision); Perez-Tejada v. Mattress Firm, Inc., No. CV 17-12448-DJC, 2019 WL 830450, at *5 (D. Mass. Feb. 21, 2019) (Casper, J.) (holding the employees' signatures on the Agreement indicated their intention to enter into the Arbitration Agreement).

Merchandisers are required to assent to the terms by electronically signing the document. Def.'s Reply, Ex. 1-C, Voluntary Entry & Signature Page ("Signature Page"), ECF No. 19-1. Specifically, Fraga signed the Dispute Resolution Document, which contained the arbitration provision. Arb. Agreement 9. Thus, the second step of the inquiry has been satisfied.

### 3. Conclusion

Premium has met its burden. Premium has supplied an executed electronic signature page for Fraga and screenshots of the New Hire Portal. See Def.'s Reply; New Hire Paperwork; Signature Page. Viewed reasonably, this evidence is sufficient to demonstrate that Fraga in fact signed and agreed to be bound by the conspicuous terms of the Arbitration Agreement. See Cullinane, 893 F.3d at 62 ("Under Massachusetts law, 'conspicuous' means that a term is so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it." (citations and internal quotation marks omitted)).

**B. Scope of the Agreement**

Having established that an enforceable arbitration agreement exists the Court must next determine whether Fraga's claims are within the scope of the agreement.  "[T]here is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (brackets and internal quotation marks omitted); see also Johnson Controls Sec. Sols., LLC v. Int'l Bhd. of Elec. Workers, Loc. 103, No. 21-1460, 2022 WL 262963, at *2 (1st Cir. Jan. 28, 2022) (citing At&T Techs., 475 U.S. at 648).  "Doubts should be resolved in favor of coverage." Id.  Nevertheless, the "FAA does not require parties to arbitrate when they have not agreed to do so."  Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989).  A court must first determine "whether . . . there exists a written agreement to arbitrate" the claims.  Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (internal quotation marks omitted).

Fraga makes two arguments that her claims do not fall within the scope of the arbitration agreement.  First, she argues that the Agreement is an adhesion contract and, that, as

[40]

such, the terms of the contract ought be construed against the drafter, applying the canon of construction contra proferentem. Opp'n Mem. 6-9.  Second, Fraga posits that certain terms in the Agreement are ambiguous, which also counsels in favor of "constru[ing the Agreement] against Premium's interest and in favor of non-coverage." Opp'n Mem. 9.  Premium responds that the Agreement's language is clear and Fraga's interpretation would violate the canon of ejusdem generis.  Def.'s Reply 4-5.

Whether the Agreement is an adhesion contract does not affect the determination of whether Fraga's claims are within the scope of the Agreement.  Here, the terms of the Agreement are unambiguous and Fraga's claims fall within them.

## 1. Adhesion Contracts

A contract is a contract of adhesion when it is a "standard form printed contract[] prepared by one party and submitted to the other on a 'take it or leave it' basis." Hebert v. Vantage Travel Serv., Inc., 444 F. Supp. 3d 233, 243 (D. Mass. 2020) (quoting Cappellini v. Mellon Mortg. Co., 991 F. Supp. 31, 39 (D. Mass. 1997) (Stevens, J.)), reconsideration denied, No. 17-CV-10922-DJC, 2021 WL 2516076 (D. Mass. June 18, 2021) (Casper, J.); Kristian v. Comcast Corp., 446 F.3d 25, 32 n.2 (1st Cir. 2006).  The same common law rules apply to adhesion contracts as all other contracts, including the doctrine contra proferentem that dictates ambiguous terms be read against the drafting

party.  See Hebert, 444 F. Supp. 3d at 243.  Adhesion contracts
are not per se unenforceable.  Rivera v. Centro Medico de
Turabo, Inc., 575 F.3d 10, 19 (1st Cir. 2009).  It is of no
consequence, then, whether Fraga's arbitration contract is one
of adhesion.  Rather, the key inquiry is whether the common law
rules applied to all contracts counsel against the contract's
enforcement.  One such rule is the doctrine of ambiguity, which
this Court moves to analyze next.

### 2. Ambiguity and Contract Coverage

"The common-law rules of contract interpretation state that
a court should construe ambiguous language against the interest
of the party that drafted it." Cappellini, 991 F. Supp. at 39
(emphasis in original) (internal quotation marks omitted).  By
the same token, "[i]f the wording of the contract is explicit
and its language is clear, its terms and conditions are binding
on the parties." Rivera, 575 F.3d at 19.  "Whether a term
is ambiguous is a question of law." Lanier Pro. Servs., Inc. v.
Ricci, 192 F.3d 1, 4 (1st Cir. 1999); see also Nicolaci v.
Anapol, 387 F.3d 21, 26 (1st Cir. 2004).  A contract term is
ambiguous if its language is "inconsistent on [its] face or
where the phraseology can support reasonable differences of
opinion as to the meaning of the words employed and obligations
undertaken." Nicolaci, 387 F.3d at 26 (internal quotation marks
omitted).

[42]

The provision entitled "Claims covered by this agreement" explicitly includes "claims for wages, overtime pay, . . . [and] claims regarding hours worked or not worked, including overtime . . . ." Arb. Agreement 3. The Court is unconvinced by Fraga's attempt to read ambiguity into the provision providing "[c]laims not covered by this agreement." Id. Fraga asserts claims under the FLSA and the Massachusetts Minimum Fair Wage Law, alleging entitlement to overtime compensation and unpaid time. Compl. ¶¶ 84-85, 91, 96. These claims are explicitly identified in the Agreement as among the disputes which must be arbitrated.

"[A]mbiguity in a contract should be construed against the drafter, a doctrine known as contra proferentem. The rule applies 'only as a last resort' when the meaning of a provision remains ambiguous after exhausting the ordinary methods of interpretation." Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1417 (2019) (quoting 3 A. Corbin, Contracts § 559, pp. 268-70 (1960)). Given the clarity of the Arbitration Agreement Fraga signed, there are no terms to construe against Premium.