UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
SARA FRAGA, individually and    )
 on behalf of all persons similarly)
 situated,                      )
                                )
              Plaintiff,         )
        v.                       )        CIVIL ACTION
                                )        NO. 21-10751-WGY
PREMIUM RETAIL SERVICES, INC.,   )
                                )
              Defendant.         )
_____)


YOUNG, D.J.                                December 5, 2023

**MEMORANDUM & ORDER**


**I.    PROCEDURAL HISTORY**

Sara Fraga ("Fraga") filed this suit, individually and on behalf of all persons similarly situated, against her former employer, Premium Retail Services, Inc. ("Premium"), on May 7, 2021.  See Collective & Class Action Compl. ("Compl."), ECF No. 1.  Fraga brings four claims: (1) violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; (2) violation of the Massachusetts Minimum Fair Wage Law (overtime), Mass. Gen. Laws ch. 151 §§ 1A-B; (3) violation of Massachusetts Minimum Fair Wage Law (timely wage payment), Mass. Gen. Laws ch. 151 §§ 1A-B; and (4) violation of Massachusetts Minimum Fair

Wage Law (minimum wage), Mass. Gen. Laws ch. 151 §§ 1, 7, 20. Compl. ¶¶ 77-88, 80-93, 94-98, 99-102.

Premium moved to dismiss Fraga's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3, 4.  See Mot. Compel Arb. & Dismiss Compl., ECF No. 7; Def. Premium Retail Services, Inc.'s Mem. P. & A. Supp. Mot. Compel Arb. ("Def.'s Mem."), ECF No. 8.  Fraga timely opposed Premium's motion.  Mem. Law Opp'n Def.'s Mot. Compel Arb. ("Opp'n Mem."), ECF No. 16.

Fraga's opposition raised three arguments: 1) Premium failed to meet its burden to show the arbitration agreement ("Agreement") was valid and enforceable; 2) Fraga's claims are not covered by the Agreement; and 3) Fraga, and others similarly situated, are exempt under the residual clause of Section 1 of the FAA.  See Opp'n Mem. 4-12.

This Court, in its order of January 31, 2022 ("Fraga I"), denied Premium's motion to dismiss.  See Mem. & Order, ECF No. 47.  At the time, this Court had taken no action on Premium's motion to compel arbitration.[1]  Id.  The First Circuit, in its opinion on March 3, 2023 ("Fraga II"), vacated Fraga I to the

---

[1] This Court denied Premium's motion to compel arbitration, Mot. Compel Arb. & Dismiss Compl., ECF No. 7, in its opinion and order on February 24, 2022.  See Order Feb. 24, 2022, ECF No. 58.

extent it denied arbitration and remanded the case with
directions for further proceedings consistent with its opinion.
See <u>Fraga</u> v. <u>Premium Retail Services, Inc.</u> 61 F.4th 228 (1st
Cir. 2023), (ECF. No. 70), ("<u>Fraga II</u>").

As directed, this Court then held a two-day evidentiary
hearing to resolve the issue of whether Fraga and her proposed
class members are workers engaged in interstate commerce.  This
opinion addresses that issue and resolves the necessary
sequelae.

## II.  FINDINGS OF FACT

Fraga was an employee of Premium from December 2020 to
January 2021.[2]  Compl. ¶ 25.  Premium, headquartered and
incorporated in Chesterfield, Missouri, <u>id.</u> ¶¶ 7-8, provides
varying retail support to its clients.  <u>Id.</u> ¶¶ 21; <u>see also</u>
Premium, https://premiumretail.com (last visited Nov. 30, 2023).
Premium employs thousands of merchandisers ("Merchandisers") in
all fifty states.  Compl. ¶ 22.

Merchandisers are the people you may see in a local
pharmacy or department store who are busy arranging the bottles,
sunglasses, or other products for sale so that the presentation

---

[2] Fraga's complaint states Fraga worked for Premium from
December 2020 to January 2021.  Compl. ¶ 25.  Fraga's
Declaration, however, states she worked there from December 2020
to March 2021.  Opp'n Mem., Ex. 1, Decl. Sara Fraga ¶ 2, ECF No.
16-1.

appears attractive to customers, with all the labels aligned,
the advertising fresh, and applicable discounts well displayed.
Their duties include, but are not limited to, auditing and
stocking product, building product displays, and updating
product pricing and signage, as well as staging the point-of-
purchase ("POP") materials.  Merchandisers travel between their
weekly preassigned jobsites to deliver and install the POP
materials.  Staging the POP materials involves receiving,
sorting, and arranging POP displays, packing the materials
required for each job assignment, and ensuring that displays are
paired with the appropriate assignment.  These materials are
shipped from outside Massachusetts to the individual
Merchandiser's home usually once a week (sometimes twice --
sometimes less than once a week).  Opp'n Mem., Ex. 1, Decl. Sara
Fraga ("Pl. Decl.") ¶¶ 4-7, ECF No. 16-1.  On average, it takes
a Merchandiser about an hour to sort and re-package the POP
materials for delivery to each assigned store.  Once the
Merchandisers have completed sorting and preparing their
materials at their homes, they must transport them to the
designated retail location.

Premium assigns each Merchandiser a zone of store locations
to which the Merchandiser must travel to fulfill their job
assignments.  The Merchandisers clock in and out of each
worksite using a mobile application called Q-Trax, which is a

job management system utilized by Premium.  Premium's time-clock
policy is that Merchandisers may only clock-in on Q-Trax when
they arrive at any store that is their worksite for that day and
must clock out as they leave that store.  Premium does not pay
Merchandisers for their time spent traveling.

Fraga was employed as a Merchandiser.  Her zone of store
locations included Massachusetts, Connecticut, New Jersey, and
New York.  Merchandisers receive preassigned jobsites that vary.
Fraga would visit up to or more than five retailers in one day.
Depending on the day, these retailers were located within or
outside Massachusetts.  Fraga alleges Premium only paid her for
work performed at the jobsites, after she clocked into the Q-
Trax application, and did not account for travel or home staging
time.  Compl. ¶¶ 26, 31-32.

The staging duties are executed at the Merchandisers'
homes.[3]  Fraga states that she was not compensated for performing

---

[3] This is a crucial finding.  In its declaration, Premium
averred that its general practice is to ship the staging
materials to the point of sale and the actual staging takes
place there.   Reply Supp. Def. Premium Retail Services, Inc.'s
Mot. Compel Arb., Ex. 1, Suppl. Aff. Patricia K. Balkenbush
Supp. Def.'s Mot. Compel Arb. ¶ 6, ECF No. 19-1.  At oral
argument, see Electronic Clerk's Notes, ECF No. 39, however,
Premium's counsel (at least to argue in favor of dismissal)
assumed the accuracy of Fraga's allegations.  Thereafter,
Premium backed off its original (erroneous) declaration.  In the
parties' stipulation of March 11, 2022, Premium confirmed that
"[a]t times, during her employment with Premium, Fraga received
shipments of [POP] materials at her home," just like "at least

these duties since they are not completed at the retail location where the Merchandisers are able to clock in.  See Id. ¶ 47. Fraga alleges that Premium's policy of not compensating Merchandisers for "off-the-clock" time is depriving her, and others similarly situated, of wages earned from staging duties and travel time.  Id. ¶ 48.  Thus, Fraga brings this lawsuit as a collective action on behalf of any other similarly situated individuals who may opt in.

Premium disputes this allegation and presented a witness who testified that Premium paid for this time as something called "compensatory time."  Since this dispute is at the heart of the merits of the lawsuit, this Court expresses no opinion thereon.

**III. ANALYSIS**

Following the First Circuit's Opinion, this Court now determines the applicability of section 1 of the FAA to Fraga's claims and the arbitrability of Fraga's claims.  See Fraga II at 242; 9 U.S.C. § 1.

**A.  Applicability of Section 1 of the FAA**

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such

---

100 other Merchandisers in Massachusetts."  Stipul. 2, ECF. No. 65.

contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ."  9 U.S.C. § 2.  Despite the broad scope of section 2 of the FAA, section 1 excludes from the FAA's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1 (emphasis added).

This case concerns the scope of the exemption contained in the residual clause of section 1 of the FAA.  More specifically, the question before this Court is whether Fraga and other Merchandisers fall within the category of "other class of workers engaged in interstate commerce."  This Court concludes that they do not as section 1 of the FAA does not apply to Fraga's claims.

### 1.  Scope of the Section 1 Exemption

In Circuit City Stores, Inc. v. Adams, the Supreme Court adopted a narrow reading of the FAA's section 1 exemption, stating that "[s]ection 1 exempts from the FAA only contracts of employment of transportation workers."  Cir. City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001).  "[W]hile [the Supreme Court] did not provide a complete definition of 'transportation worker,' [it] indicated that any such worker must at least play a direct and 'necessary role in the free flow of goods' across borders."  Southwest Airlines Co. v. Saxon, 596 U.S. 450, 458

(2022) (quoting Cir. City Stores, Inc., 532 U.S. at 121 (2001)).
The Supreme Court emphasized that "transportation workers must
be actively 'engaged in transportation' of those goods across
borders via the channels of foreign or interstate commerce."
Id.

In Waithaka v. Amazon.com, the First Circuit held that
"last-mile delivery drivers who haul goods on the final legs of
interstate journeys are transportation workers . . . regardless
of whether the workers themselves physically cross state lines."
See Waithaka v. Amazon.com Inc., 966 F.3d 10, 26 (1st Cir.
2020).

### 2.  The Case at Bar

Fraga analogizes her job duties to that of a last-mile
delivery driver.  See Opp'n Mem. 10-11.  In so doing, Fraga
argues that she, and similarly situated Merchandisers, were (or
are) "workers engaged in foreign or interstate commerce" who are
exempt from the enforcement provisions of the FAA, and by
extension, that Premium's related class action waiver and the
Agreement itself are unenforceable under Massachusetts law.  See
id. at 9-12.  Supporting her argument, Fraga received the POP
materials traveling interstate and "transported, delivered, and
installed [the] POP materials at various retail locations in
Massachusetts, Connecticut, New Jersey, and New York."  Id. at
11.  Fraga argues that the nature of her work "constitute[s]

part of the continuous flow of interstate commerce" and is therefore covered by the exemption.  Id. (internal quotation marks omitted).

Premium asserts that Fraga is a "retail worker" and thus she is not covered by the exemption.  Reply Supp. Def. Premium Retail Services, Inc.'s Mot. Compel Arb. ("Def.'s Reply") 6-7, ECF No. 19.

### 3. Legal Standard

The scope of section 1 turns in part on whether a particular employee is "engaged in interstate commerce." Waithaka, 966 F.3d at 20.  In determining whether an individual employee is "engaged in interstate commerce," the following factors are to be considered but are not dispositive.  First, an individual worker need not cross a state line.  See id. at 26; see also Walling v. Jacksonville Paper Co., 317 U.S. 564, 567-68 (1943) (holding that "interstate commerce" in the context of the FLSA encompasses the "entire movement of [goods] until their interstate journey [is] ended," which does not occur until "they reach the customers for whom they are intended").  Second, a "worker need not work for a transportation company" to be considered a transportation worker.  Saxon v. Southwest Airlines Co., 993 F.3d 492, 497 (7th Cir. 2021).  Third, the worker's title is not dispositive nor is the line of business of their employer.  See Southwest Airlines Co., 596 U.S. at 456 (holding

that the employee "Saxon is . . . a member of a 'class of workers' based on what she does at [her employer] Southwest, not what [her employer] Southwest does generally").

The key focus of the analysis ought be on what the worker actually does.  Id.  If a worker's activity is closely related to interstate transportation, it ought be considered a part of interstate transportation.  See Shanks v. Del., Lackawanna & W.R.R. Co., 239 U.S. 556, 558-59 (1916) (holding that the language "engaging in commerce" includes "employees engaged in interstate transportation, or in work so closely related to it as to be practically a part of it"); Southwest Airlines Co., 596 U.S. at 457 (holding that "it is 'too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it'" (quoting Baltimore & Ohio Sw. R.R. Co. v. Burtch, 263 U.S. 540, 544 (1924))).

Thus, an employee whose work is closely related to the act of transporting, but that does not necessarily involve the act of transportation itself, is covered by section 1 of the FAA.

As noted in Fraga II, the Supreme Court in Southwest Airlines Co. concluded that a worker belongs to a class of transportation workers if the worker performs that work frequently.  See Southwest Airlines Co., 596 U.S. at 456

[10]

(holding that "[the employee] Saxon belongs to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis"); Fraga II at 234.  To establish whether Fraga and other Merchandisers belong to a class of transportation workers, the First Circuit instructed this Court to determine whether Fraga and other Merchandisers delivered the POP materials to retailers frequently.  See Fraga II at 242.

The Supreme Court in Southwest Airlines Co. did not clarify how often work should be performed by the worker to be considered frequent.  See Southwest Airlines Co., 596 U.S.  The Supreme Court, however, premised its conclusion on the fact that "[the employee Saxon] 'and the other ramp supervisors . . . frequently fill in as ramp agents' for up to three shifts per week."  Id. at 456 (emphasis added) (quoting Saxon, 993 F.3d at 494).  In Canales v. CK Sales Co., LLC, the First Circuit held that the "plaintiffs frequently deliver[ed] goods in trucks to stores" when they did it "for at least fifty hours every week," working usually from seventy to eighty hours a week in total.  Canales v. CK Sales Co., LLC, 67 F.4th 38, 46 (1st Cir. 2023) (emphasis added).

In Fraga II, the First Circuit emphasized that "the sorting, loading, and transportation of the POP materials" performed "for two or more hours most every day would seem to be work that was performed frequently by any measure."  Fraga II at

237 (emphasis added).  Following this guidance, if Fraga sorted,
loaded, and transported the POP materials to retailers for at
least two hours a day almost every day, this Court ought
conclude that such activity was frequent.

### 4.  Applying the Test

As this Court found in Fraga I, Fraga's duties, among other
things, included "receiving, sorting, and preparing [POP]
display materials."  Pl. Decl. ¶ 4; see Fraga I at 23, 24.  The
POP display materials were shipped from outside Massachusetts to
Fraga's Massachusetts home -- i.e., moving interstate --, then
Fraga transported the POP display materials to their final
destination.  See Fraga I at 24.  When Fraga engaged with the
POP materials, they were in the midst of their interstate
journey.  See id.  Fraga was a part of the intrastate -- and at
times interstate -- leg of an integrated interstate journey,
intercepting the POP materials mid-journey and facilitating
their movement to their final destination.

Fraga's job duties at home were similar to those of a
worker sorting goods in a warehouse during their interstate
journeys.  Prior to delivering the goods to their final
destination, she "search[ed] and sort[ed] through the POP
materials" to determine which of the POP materials needed to go
to which retail location.  See Fraga I at 24.

### a. Frequency

Fraga, however, has not proved that she and other Merchandisers were sorting, loading, and transporting the POP materials to retailers anywhere near the frequency of the plaintiffs in Southwest Airlines Co. and Canales.  See Southwest Airlines Co., 596 U.S. at 456 (holding that "[the employee Saxon] and the other ramp supervisors . . . 'frequently fill in as ramp agents' for up to three shifts per week"); Canales, 67 F.4th at 46 (holding that the "plaintiffs frequently deliver[ed] goods in trucks to stores" when they did it "for at least fifty hours every week").  Nor has Fraga demonstrated that she and other Merchandisers performed sorting, loading, and transportation of the POP materials to retailers for two or more hours a day almost every day during their employment with Premium.

Instead, here Merchandisers receive POP materials, on average, not more than once or twice a week and the time to sort and arrange such materials by destination rarely exceeds one hour.

As the Supreme Court held in Green Tree Financial Corp.-Alabama v. Randolph, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 91 (2000).  Here, Fraga did not meet that burden.

[13]

Thus, this Court concludes that Fraga and other Merchandisers'
activity involving sorting, loading, and transporting the POP
materials to retailers located within or outside Massachusetts
during their employment with Premium was not frequent.
Consequently, Fraga and other Merchandisers do not belong to a
class of transportation workers, are not covered by section 1 of
the FAA, and are not exempt from their contractual obligations
to arbitrate their claims against Premium.

### b. Interstate or Intrastate

The First Circuit also instructed this Court to determine
whether Merchandisers' transportation of the POP materials to
the retail stores is more like the **interstate** transportation in
Waithaka v. Amazon.com Inc., and the first scenario in United
States v. Yellow Cab Co., or more like the **intrastate**
transportation in Immediato v. Postmates, Inc., Cunningham v.
Lyft, Inc., and the second scenario in United States v. Yellow
Cab Co.   See Fraga II at 27.

In Waithaka, 966 F.3d at 20, the First Circuit held that
the last-mile delivery drivers were engaged in interstate
commerce even though their "role in transporting the goods
occurred entirely within a single state," following United
States v. Yellow Cab Co., 332 U.S. 218, 228 (1947), overruled on
other grounds, 467 U.S. 752 (holding that local taxi service
between Chicago's rail stations was "a part of the stream of

interstate commerce" because the railroads contracted with the interstate train passengers and taxi companies to provide that transport).

In Immediato v. Postmates, Inc., 54 F.4th 67, 78 (1st Cir. 2022), the First Circuit held that "couriers making deliveries from local businesses are transporting goods as part of local intrastate commerce."  Accord Cunningham v. Lyft, Inc., 17 F.4th 244, 250 (1st Cir. 2021) (holding that the Lyft drivers transporting the passengers to or from the airport in Boston were not involved in the passengers' interstate journey because that transportation was a part of the Lyft driver's "normal local service to take the passengers to the start (or from the finish) of the passengers' interstate journey"), following Yellow Cab Co., 332 U.S. at 233, overruled on other grounds, 467 U.S. 752 (holding that "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation").

Frequency plays no part in this aspect of the analysis. Indeed, Fraga and her fellow Merchandisers transport the sorted POP materials from their homes to their respective assigned stores daily, where they are best placed to attract purchasers. This is the essential last step in the interstate transportation

of these POP materials to the retail display.  Is this analogous
to the interstate transportation in Waithaka v. Amazon.com Inc.,
966 F.3d at 20, and the first scenario in United States v.
Yellow Cab Co., 332 U.S. at 228?  If so, Fraga and other
Merchandisers ought be considered workers "engaged in interstate
commerce" and, therefore, covered by the FAA's section 1
exemption.  See 9 U.S.C. § 1.  That is not, however, the case
here.

　　　Such an analysis is flawed.  It risks morphing an
incidental aspect of the Merchandisers' job into the central
characterization of it.  The commercial goods here are the
cosmetics, sunglasses, laxatives, and like products
Merchandisers never transport.  Transportation workers move
these goods to retailers for sale.  Merchandisers daily dress up
these commercial goods with point of purchase advertising,
discounts, and coupons.  This advertising work is important, but
it is simply not "so closely related to interstate
transportation as to be practically a part of it."  Waithaka,
966 F.3d at 20 (internal quotation marks omitted).  The
exemption, therefore, does not apply here.[4]

---

[4] Perhaps a hypothetical can best illustrate this Court's
analysis: Suppose one of these new electronic billboards is to
be erected along the interstate.  The truck driver of the 18-
wheeler who brings the girders, the steel frames, and guy wires
from the Mid-West is a transport worker.  The iron workers,

**B.  Arbitrability of Fraga's Claims**

"A party seeking to compel arbitration under the FAA [bears the burden of demonstrating] 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'"  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011) (quoting InterGen

---

crane operators, electricians, and computer programmers who erect the billboard are not.

Now suppose the Mid-Western billboard manufacturer has developed a proprietary module it calls The Secret Key.  To ensure secrecy, it mails The Secret Key to its Senior Program Engineer at her home here in Massachusetts.  She checks it out at home and carries The Secret Key to the billboard where, using a proprietary method, she installs The Secret Key.  Voila!  The billboard lights up to its prescribed brightness, shuffles the ads into a tasteful montage, i.e., the airline ad is nowhere near the mortuary ad, and the highest paying advertisers each get the extra 10, 15, or 30 seconds for which they have paid.

It takes the contributions of all these professionals to emplace the billboard and make it work, yet only the truck driver is a transport worker.  This is but common sense.  If the Senior Project Engineer is a transport worker, then so is the electrician who brings along some fiber optic cable from another state and the crane operator who swings the heavy frame the last 50' up into position.

Simply put, transport workers move people and merchandise in interstate commerce.  Like seamen and railway workers, these are the transport workers who fall within the section 1 exemption.

N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)).  Premium has
met its burden.

### 1.  Validity and Enforcement of the Agreement

"When deciding whether the parties agreed to arbitrate a
certain matter (including arbitrability), courts generally . . .
should apply ordinary state-law principles that govern the
formation of contracts."  First Options of Chi., Inc. v. Kaplan,
514 U.S. 938, 944 (1995); see also Cullinane v. Uber Techs.,
Inc., 893 F.3d 53, 61 (1st Cir. 2018).

In determining whether there is a valid and enforceable
arbitration agreement, the First Circuit, relying on reasoning
from the Massachusetts Appeals Court in Ajemian v. Yahoo!, Inc.,
83 Mass. App. Ct. 565 (2013), articulated a two-step inquiry:
"[t]he first inquiry is whether the contract terms were
'reasonably communicated to the plaintiffs'" and "[t]he second
is whether the record shows that those terms were 'accepted and,
if so, the manner of acceptance.'"  Cullinane, 893 F.3d at 62
(quoting Ajemian, 83 Mass. App. Ct. at 575).  An online
contract, under Massachusetts law, is enforceable under a
similar showing.  See Immediato v. Postmates, Inc., No. CV 20-
12308-RGS, 2021 WL 828381, at *4 (D. Mass. Mar. 4, 2021)
(Stearns, J.) (citing Kauders v. Uber Techs., Inc., 486 Mass.
557, 572 (2021)), aff'd, 54 F.4th 67 (1st Cir. 2022).  Here,
both steps of the inquiry are satisfied.

**a. Terms of the Agreement Were Reasonably Communicated**

"[I]n the context of web-based contracts . . . clarity and conspicuousness are a function of the design and content of the relevant interface." Cullinane, 893 F.3d at 62 (citing Meyer v. Uber Techs., Inc., 868 F.3d 66, 75 (2d Cir. 2017)). "Under Massachusetts law, 'conspicuous' means that a term is 'so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it.'" Cullinane, 893 F.3d at 62. Massachusetts General Laws chapter 106 includes a list of general characteristics that make a term "conspicuous," including contrasting size and type of font, use of headings in capitals, and setting apart the term from the surrounding text through means of symbols or other marks. Mass. Gen. Laws ch. 106, § 1-201(b)(10). "Whether a term is 'conspicuous' . . . is a decision for the court." Id.

Fraga and other Merchandisers' New Hire Paperwork outlined the arbitration agreement documents with a bolded heading in a larger size font than the surrounding text. See Def.'s Reply, Ex. 1-A, Premium New Hire Paperwork, ECF No. 19-1. Above the signature line, the following final notice was also given in all-capital letters:

> EACH OF THE PARTIES UNDERSTANDS THAT THIS AGREEMENT
> CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE
> ENFORCED BY THE OTHER PARTY, AND THAT BY SIGNING THIS
> AGREEMENT, EACH PARTY IS GIVING UP ITS RIGHT TO A JURY
> TRIAL FOR THE CLAIMS COVERED.

Def.'s Mem., Ex. 3, Premium Dispute Resolution Program ("Arb.
Agreement") 5, ECF No. 8-3.

Additionally, Fraga and other Merchandisers could not sign
the Dispute Resolution Program document until scrolling through
the document in its entirety.  See Arb. Agreement 6.  Thus, the
arbitration agreement was conspicuously outlined and provided
sufficient notice, making it reasonably communicated.

### b. Terms of the Agreement Were Accepted

This Court has held that clicking an "I accept" button
manifests assent and that a signature manifests the same.  See
e.g., Murray v. Grocery Delivery E-Services USA Inc., 460 F.
Supp. 3d 93, 97 (D. Mass. 2020) (suggesting that clicking "I
agree" on a clickwrap agreement that includes an arbitration
clause constitutes assent); Bekele v. Lyft, Inc., 199 F.Supp.3d
284, 298 (D. Mass. 2016) (Saylor, J.) (holding that drivers
manifested assent to arbitrate when they electronically clicked
the "I accept" button on the arbitration provision); Perez-
Tejada v. Mattress Firm, Inc., No. CV 17-12448-DJC, 2019 WL
830450, at *5 (D. Mass. Feb. 21, 2019) (Casper, J.) (holding the
employees' signatures on the Agreement indicated their intention
to enter into the Arbitration Agreement).

Merchandisers are required to assent to the terms by
electronically signing the document.  Def.'s Reply, Ex. 1-C,
Voluntary Entry & Signature Page, ECF No. 19-1.  Premium has

supplied an executed electronic signature page for Fraga.  See
Arb. Agreement 6.  Thus, having signed the Dispute Resolution
Program document, which contained the arbitration provision,
Fraga accepted the terms of the Agreement.  See Arb. Agreement
6.

### 2.  Entitlement to Invoke the Arbitration Clause and its Binding Nature

As Premium and Fraga are parties to the Agreement, this
Court concludes that Premium is entitled to invoke the
arbitration clause and that Fraga is bound by it.

### 3.  Scope of the Agreement

Having established that an enforceable arbitration
agreement exists, the Court must next determine whether Fraga's
claims are within the scope of the agreement.  "[T]here is a
presumption of arbitrability in the sense that an order to
arbitrate the particular grievance should not be denied unless
it may be said with positive assurance that the arbitration
clause is not susceptible of an interpretation that covers the
asserted dispute."  AT&T Techs., Inc. v. Commc'ns Workers of
Am., 475 U.S. 643, 650 (1986) (brackets and internal quotation
marks omitted); see also Johnson Controls Sec. Sols., LLC v.
Int'l Bhd. of Elec. Workers, Loc. 103, No. 21-1460, 2022 WL
262963, at *90 (1st Cir. Jan. 28, 2022) (citing AT&T Techs., 475
U.S. at 650).  "Doubts should be resolved in favor of coverage."

AT&T Techs., 475 U.S. at 650; United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960). Where an arbitration provision's scope is unclear, arbitration is the favored means of dispute resolution. See e.g., Ouadani v. TF Final Mile LLC, 876 F.3d 31, 36 (1st Cir. 2017). "[A]mbiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 7 (1st Cir. 2014) (citing PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010)). "This presumption in favor of arbitration applies unless the party opposing arbitration rebuts it." Id.

Nevertheless, the "FAA does not require parties to arbitrate when they have not agreed to do so." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989). No party should "be required to submit to arbitration any dispute which [it] has not agreed so to submit." Ouadani, 876 F.3d at 36 (quoting AT&T Techs., 475 U.S. at 648); see also Grand Wireless, Inc., 748 F.3d at 7. A court must first determine "whether . . . there exists a written agreement to arbitrate" the claims. Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (internal quotation marks omitted). "To determine whether [the plaintiff's] claims fall within the scope of the arbitration clause, [the focus

should be] on the factual allegations underlying [the] claims in the [c]omplaint."  <u>Grand Wireless, Inc.</u>, 748 F.3d at 7.

Fraga makes two arguments that her claims do not fall within the scope of the Agreement.  First, she argues that the Agreement is an adhesion contract and, that, as such, the terms of the contract ought be construed against the drafter, applying the canon of construction <u>contra proferentem</u>.  Opp'n Mem. 6-9.

Second, Fraga posits that certain terms in the Agreement are ambiguous, which also counsels in favor of "constru[ing the Agreement] against Premium's interest."  <u>See</u> Opp'n Mem. 9. Premised on this, Fraga argues that her claims are outside the scope of the Agreement due to the language of the provision entitled "Claims not covered by this agreement."  <u>See</u> Opp'n Mem. 8-9.  Premium responds that the Agreement's language is clear and Fraga's interpretation would violate the canon of <u>ejusdem generis</u>.  Def.'s Reply 4-5.

Fraga's arguments lack merit.  Whether the Agreement is an adhesion contract does not affect the determination of whether Fraga's claims are within the scope of the Agreement.  As the terms of the Agreement are unambiguous and Fraga's claims are covered explicitly by the "Claims covered by the agreement" provision, the Court rules that Fraga's claims fall within the Agreement.  <u>See</u> Arb. Agreement 3.

### a. Adhesion Contracts

A contract is a contract of adhesion when it is a "standard form printed contract[] prepared by one party and submitted to the other on a 'take it or leave it' basis." Hebert v. Vantage Travel Serv., Inc., 444 F. Supp. 3d 233, 243 (D. Mass. 2020) (Casper, J.) (quoting Cappellini v. Mellon Mortg. Co., 991 F. Supp. 31, 39 (D. Mass. 1997) (Stevens, J.)), reconsideration denied, No. 17-CV-10922-DJC, 2021 WL 2516076 (D. Mass. June 18, 2021) (Casper, J.); Kristian v. Comcast Corp., 446 F.3d 25, 32 n.2 (1st Cir. 2006). The same common law rules apply to adhesion contracts as all other contracts, including the doctrine contra proferentem that dictates ambiguous terms be read against the drafting party. See Hebert, 444 F. Supp. 3d at 243. Adhesion contracts are not per se unenforceable. Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 19 (1st Cir. 2009). It is of no consequence, then, whether Fraga's arbitration contract is one of adhesion. Rather, the key inquiry is whether the common law rules applied to all contracts counsel against the contract's enforcement. One such rule is the doctrine of ambiguity, which this Court moves to analyze next.

### b. Ambiguity and Contract Coverage

"The common-law rules of contract interpretation state that a court should construe ambiguous language against the

interest of the party that drafted it." <u>Cappellini</u>, 991 F.
Supp. at 39 (emphasis in original) (internal quotation marks
omitted).  By the same token, "[i]f the wording of the contract
is explicit and its language is clear, its terms and conditions
are binding on the parties." <u>Rivera</u>, 575 F.3d at 19.  "Whether
a term is ambiguous is a question of law." <u>Lanier Pro. Servs.,</u>
<u>Inc.</u> v. <u>Ricci</u>, 192 F.3d 1, 4 (1st Cir. 1999); <u>see also</u> <u>Nicolaci</u>
v. <u>Anapol</u>, 387 F.3d 21, 26 (1st Cir. 2004).  A contract term is
ambiguous if its language is "inconsistent on [its] face or
where the phraseology can support reasonable differences of
opinion as to the meaning of the words employed and obligations
undertaken." <u>Nicolaci</u>, 387 F.3d at 26 (internal quotation marks
omitted).

The provision entitled "Claims covered by this agreement"
explicitly includes "claims for wages, overtime pay, . . . [and]
claims regarding hours worked or not worked, including overtime
. . . ." Arb. Agreement 3.  The Court is unconvinced by Fraga's
attempt to read ambiguity into the provision providing "[c]laims
not covered by this agreement." <u>Id.</u>  Fraga asserts claims under
the FLSA and the Massachusetts Minimum Fair Wage Law, alleging
entitlement to overtime compensation and unpaid time.  Compl. ¶¶
84-85, 91, 96.  These claims are explicitly identified in the
Agreement as among the disputes which must be arbitrated.  <u>See</u>
Arb. Agreement 3.

Even if the Court were less certain of the Agreement's applicability to Fraga's claims, the Court would be obligated to apply the presumption of arbitrability.  See e.g., Grand Wireless, Inc., 748 F.3d at 8; Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 25 (1st Cir. 2000) (holding that the presumption of arbitrability is applied to scope questions that arise "when the parties have a contract that provides for arbitration of some issues and it is unclear whether a specific dispute falls within that contract") (internal quotation marks omitted).  Fraga presented no strong evidence to rebut the presumption of arbitrability.

"[A]mbiguity in a contract should be construed against the drafter, a doctrine known as contra proferentem.  The rule applies 'only as a last resort' when the meaning of a provision remains ambiguous after exhausting the ordinary methods of interpretation."  Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1417 (2019) (quoting 3 A. Corbin, Contracts § 559, pp. 268-70 (1960)).  Given the clarity of the Agreement Fraga signed, there are no terms to construe against Premium.

## IV.  CONCLUSION

For the foregoing reasons, this Court holds the following.

First, Fraga and other Merchandisers' work, involving sorting, loading, and transporting the POP materials to retailers located within or outside Massachusetts during their

employment with Premium, was not performed frequently and was not closely related to interstate transportation.  Consequently, Fraga and other Merchandisers do not belong to a class of transportation workers and, thus, are not covered by Section 1 of the FAA and not exempt from their contractual obligations to arbitrate their claims against Premium.  At the same time, this Court still DENIES Premium's motion to dismiss, ECF. No. 7.

Second, Premium has met its burden of demonstrating that a valid agreement to arbitrate exists, that Premium is entitled to invoke the arbitration clause, that Fraga is bound by that clause, and that Fraga's claims fall within the scope of the arbitration clause.  Accordingly, this action is administratively closed to offer the parties a chance to arbitrate their dispute.

V.   **WHAT NOW?  AND A FEW OBSERVATIONS**

And so the courthouse doors close, barring Fraga and the class of merchandisers she seeks to represent.

Rather than dismissing this case, the Court orders it administratively closed to afford Fraga[5] the opportunity to seek arbitration as her agreement requires.  This case is not over. The case may be reopened upon motion of either party upon

---

[5] She is on her own now since the mandatory arbitration clause forbids class action treatment, further impairing her chances for relief.  But let that bide.

conclusion of the arbitration, to report a settlement, or in the unlikely event that Premium obstructs the arbitration and forfeits its right to that forum.

Two final points need to be made:

**What ought be a quick preliminary determination is becoming the main event.** Fraga filed this case on May 7, 2021. Two and one half years have passed, resulting in three full scale judicial opinions and a two-day evidentiary hearing with 6 witnesses and hundreds of pages of exhibits (and Fraga may yet appeal this Court's determination). Yet none of this extensive judicial activity has addressed the merits of this dispute. Why? A majority of the Supreme Court has barred the lower courts from any meaningful role in adjudicating most employer-employee disputes where there is an employer-imposed mandatory arbitration agreement. This effectively eviscerates years of hard-fought Congressional protections for American workers. The sad irony is that, had the arbitration bar not blocked Fraga's lawsuit, this case would long since have been resolved as it is simply a "myth" that arbitration is either faster or cheaper than a well-run federal district court where employees have access to a jury of their peers. See Cellinfo, LLC v. American Tower Corp., 506 F. Supp. 3d 61 (D. Mass. 2020).

**No principled distinction exists today among those rights which have unfettered access to courts and juries.** Congress is

not impotent here.  Where the arbitration bar frustrated legitimate claims of sexual harassment, a bipartisan majority of Congress simply removed it.  See 9 U.S.C. § 402.  Yet what about racial, gender, age, and disability discrimination?  What about wage theft?  Are they not just as deserving of the access to courts and juries that they enjoyed when Congress passed landmark legislation to guarantee worker rights in each of these areas?

These, of course, are policy questions beyond the power of a district judge to address.  When these issues arise in litigation before the Court, I can only ask "Why?"

I'm asking.


                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                              JUDGE
                                              of the
                                        UNITED STATES[6]


---

[6] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.